STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-166

BRADLEY GRIFFITH

VERSUS

RESA LATIOLAIS

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. C-20055193, DIV. H3
HONORABLE DAVID A. BLANCHET, DISTRICT JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Sylvia R. Cooks, J. David Painter, and James T. Genovese, Judges.

AFFIRMED.

Bradford H. Felder
G. Andrew Veazey
Huval, Veazey, Felder, & Renegar, L.L.C.
2 Flagg Place
Lafayette, LA 70508
Counsel for Defendant/Appellant:
      Resa Latiolais

Julie Vaughn Felder
Julie Koren Vaughn Felder, APLC
P.O. Box 80399
Lafayette, LA 70598
Counsel for Defendant/Appellant:
      Resa Latiolais

D. Reardon Stanford
Hoyt & Stanford, L.L.C.
315 S. College Road, Ste. 165
Lafayette, LA 70503
Counsel for Plaintiff/Appellee:
      Bradley Griffith

**PAINTER, Judge.**

The Louisiana Supreme Court remanded this case to the trial court for reconsideration of its joint custody implementation plan in light of the supreme court's designation of the mother as domiciliary parent and for amendment if the trial court found it to be appropriate. Following the trial court's modification of the joint custody implementation plan on remand, the mother appealed. For the following reasons, we affirm the trial court's ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background of this case is well known to this court and was set forth by the Louisiana Supreme Court in *Griffith v. Latiolais*, 10-754, pp. 1-13 (La. 10/10/10), 48 So.3d 1058, 1060-67 (footnotes omitted), as follows:

> In this highly acrimonious custody battle, Bradley Griffith ("Brad") filed suit in October, 2005 against Resa Latiolais ("Resa"), the mother of his son, Cole Griffith ("Cole"), seeking sole custody of Cole. Cole was born on November 19, 2001 and lived with Resa from that time until the commencement of this litigation. Brad and Resa were not married. Brad visited Cole freely at Resa's home during this time, but Resa was his sole caretaker. Resa also has a daughter from a prior marriage, Lana Latiolais, who was 16 at the commencement of the litigation.

> In September of 2005, Resa, Cole, Lana, and Greg Chappell, Resa's new boyfriend, evacuated together to escape Hurricane Rita. When they returned, Brad picked up Cole, who evidently told Brad that he, Resa, and Greg slept in the same bed during the evacuation and that Greg was hurting Resa. From this Brad inferred that Resa and Greg had sexual relations in Cole's presence. On October 5, 2005, Brad filed a petition seeking sole custody of Cole, alleging Resa had "lately not made choices which are in the child's best interest and has been hurtful to the child." Resa answered the petition denying the allegations. Further, she sought joint custody and to be named the domiciliary parent.

> Later in October of 2005, Lana left her mother's home and went to the home of a friend where she reported that she had previously been struck in the mouth by her mother and that on October 26, 2006, her mother struck her in the back. She also reported that her mother had whipped Cole with a wooden spoon as a means of discipline. Lana subsequently recanted these allegations and the Office of Child Services investigated these claims and found no child abuse had occurred. Although Brad filed no subsequent pleadings asserting any other grounds for sole custody, he later asserted that his reasons were that Resa had sexual relations with Greg in Cole's presence during the evacuation, that Resa and her father spanked Cole during Cole's third birthday party, and that Resa was abusive to Cole and Lana.

1

On November 28, 2005, the trial court signed an "Order for Mental Health Evaluation" appointing Dr. Lyle LeCorgne, Ph.D., to perform a custody evaluation of the parents and Cole, as well as Lana, Greg Chapell, and Cindy Hebert, the mother of Brad's 15-year-old daughter, Paige. Dr. LeCorgne issued a written report containing his findings and recommendations on April 27, 2006, in which he made the following recommendations:

1. On the basis of the present assessments, it is the opinion of this examiner that the best interests of Cole Griffith are served by Brad Griffith being declared the domiciliary parent and Cole living primarily with his father. Resa Latiolais shall be granted reasonable visitation consisting of alternating weekends, with a condition of supervision, and no overnight visits until such time that Resa Latiolais has engaged in individual psychotherapy with a qualified mental health professional. Upon the recommendation of that qualified mental health professional the condition of supervision is subject to be removed and the visitation gradually increased to include alternating weekends from Thursday through Monday mornings. It is also recommended that Cole Griffith and Lana Latiolais be referred for individual psychotherapy to assist each of them in reconciling their respective emotional distress.

2. Once the condition of supervision has been removed, summer visitation shall be divided equally between the parents, with Cole spending alternating weeks with each parent. Major holidays and vacations during the school year shall be alternated and evenly distributed according to a schedule that is mutually agreeable to the parties.

3. All of the parties in this matter shall facilitate, encourage, and support the child's natural loyalty to the other parent. No adult in this matter shall make any critical, denigrating, or derogatory comments about any of the other adults to Cole or in his presence.

4. Each of the parties shall enroll in and complete the Children Cope with Divorce classes sponsored by the Family Tree Parenting Center in Lafayette, Louisiana, if they have not already done so.

5. Each of the parties shall enroll in and complete the Cooperative parenting classes sponsored by the Family Tree Parenting Center in Lafayette, Louisiana, if they have not already done so. Resa Latiolais shall also enroll in and complete a course in anger management in a program deemed acceptable to the Court.

On May 1, 2006, the trial court appointed Dr. Kenneth Bouillion to counsel the minor child, and ordered that Resa undergo individual counseling, which she began with Margot Hasha, LCSW, BCD. The trial court also ordered that Resa's custodial periods be supervised until Dr. LeCorgne was satisfied that she had progressed sufficiently in individual therapy to lift the supervision. The parties stipulated that Brad would participate in a psychological evaluation to be performed on the parties

2

and the minor child by a mental health professions [sic] of Resa's choosing. This evaluation was performed by Drs. Owen Scott, Ph.D. and Mary Lou Kelley, Ph.D. Drs. Scott and Kelley issued a report on August 17, 2006, recommending the following:

> 1. That Cole alternate weeks between his mother and his father's homes from Friday to Friday. Also, we recommend that he spend four hours to one day during the week with the alternate parent and split or alternate holidays with each parent.
>
> 2. That Ms. Latiolais be the domiciliary parent and decision maker regarding schooling and medical concerns. She has a long history of being the primary caretaker who made these decisions and her therapist views her as a competent parent. However, Ms. Latiolais and Mr. Griffith should discuss and attempt to reach a decision in all significant matters involving Cole.
>
> 3. That Cole continue to attend Ms. Shannon's preschool given his positive adjustment to the environment. Also, that Cole attend the preschool every regular school day irrespective of the parent with whom he resides.
>
> 4. That Cole's parents meet monthly with Dr. Bouillion, Cole's therapist[,] to discuss parenting issues.
>
> 5. That Cole's parents refrain from saying negative things about one another. In particular, we recommend that Mr. Griffith stop perpetuating accusations of Ms. Latiolais as a "batterer" or abuser. All concerns should be discussed with Ms. Latiolais present in meetings with Dr. Bouillion.

At trial, the above experts testified regarding their findings and recommendations, as did numerous fact witnesses attesting to various faults, misdeeds, and attributes of the parties. As for the experts, Dr. LeCorgne testified consistent with his report that Brad should be named the domiciliary parent with the goal being shared custody, while Drs. Kelley and Scott testified that Resa should be the domiciliary parent. Dr. Scott explained their reasoning for this as follows:

> Well, we felt like that because of Brad's lack of belief in her, that it was going to be difficult for them to work together, and that his attitude towards her was more negative than her attitude towards him. And we felt like she would be better able to factor in Brad being involved as a father than he would be able to factor in Resa being involved as a mother. We felt like she would be more likely to make decisions that would be balanced in that regard that would not try to exclude him.

Dr. LeCorgne testified he lifted the condition of supervised visitation in August of 2006. Dr. Bouillion testified as to the progress made by the parents, and testified while he thought Dr. LeCorgne's recommendation was reasonable, he was not going to make a recommendation about custody because he was Cole's therapist. He gave his opinion that both parents needed to continue co-parenting

3

classes, that both were making good progress, and that both needed to continue to see him until the conflicts were resolved. Margot Hasha testified that on May 10, 2006, she wrote a letter to Dr. LeCorgne recommending that Resa be allowed unsupervised visitation based on the progress she was making in individual therapy. She testified that while Resa admitted to her that she hit Cole with a wooden spoon and had "struck Lana," she did not think Resa had an anger problem or was abusive to her children. Hasha testified that Resa had complied with everything the court had ordered, including 6 weeks of co-parenting classes, and 8 weeks of anger management classes, and that she had no concerns about her ability to be a safe and effective parent. She recommended that Resa continue to see her once a month and that she continue co-parenting with Dr. Bouillion.

The trial court described its findings about Brad's behavior as follows:

The Court finds that the reason Brad instituted this instant action is because he was upset over the relationship between Resa and Mr. Chappell. Brad clearly desired to control Resa and her relationship with Mr. Chappell. Throughout this twelve (12) day trial, the Court observed Mr. Griffith to be calm and collected, never becoming angry or upset. The testimony of Lafayette Parish Sheriff's Deputy Ronald Robicheaux was very telling. On October 28, 2005, Deputy Robicheaux received a "keep the peace" call to supervise an exchange of Cole between Resa and Brad. In his testimony, Deputy Robichaux indicated that Brad was "pretty irate" because Resa had another man with her. He described Brad as screaming, hollering, and aggressive, though not in a physical way, as well as being upset and irrational. Although Brad claimed that this was because Mr. Chappell was videotaping the exchange, Deputy Robichaux testified that he never saw a camera in Mr. Chappell's possession.

. . . .

While the Court finds the parties are fairly even on the remaining factors, they have both fallen woefully short in encouraging a close and continuing relationship between the minor child and the other parent. Though Brad has claimed to want a good working relationship with Resa, and even paid for co-parenting therapy, he has engaged in an intentional pattern of conduct designed to place her under severe stress and destabilize her life. Also, Brad has appeared to follow this Court's suggestions throughout this litigation while surreptitiously setting his own agenda. Further, Brad has shown a propensity to manipulate people, especially females, to fulfill his agenda of winning custody, while at the same time crushing Resa psychologically, financially, and criminally.

At the conclusion of a hearing in this matter on January 19, 2006, this Court strongly suggested to Brad that he distance himself from Jan Huffman, and her daughter, Jessica Harbin. Both of these women had overly

4

involved themselves in this situation by encouraging Lana to turn against her mother [in reporting abuse by Resa] and supporting Brad's quest for sole custody. The Court stated:

> I really think you need to be careful about Ms. Huffman. Make it very clear to her that she needs to, please, stay out of your business; you will stay our of hers.

In discussing Ms. Huffman and her daughter, the Court stated:

> I don't know if they are troublemakers, or she saw something that she thought she saw, or what the deal is. But again, I don't think I would put a lot of stock in what Ms. Huffman and her daughter had to say about the situation from here on out, Mr. Griffith. You need to set some boundaries with them. There is a little too much going on with them.

> After reviewing the massive numbers of telephone communications and hours of telephone calls between Brad and Jan Huffman, and Brad and Jessica Harbin, as well as the timing of these calls, the Court has no doubt that Brad not only ignored this Court's strong suggestion, but actually used these women to attempt to get Resa in criminal trouble and cause her stress and anxiety as a tactic to win custody of Cole. Brad's testimony that these many hours of phone calls were to discuss politics in St. Landry Parish and matters other than this custody litigation is simply not credible. Jan Huffman and Jessica Harbin have harassed Resa with false criminal charges of stalking and a false allegation that Resa tried to run Jessica Harbin over with her van. These complaints resulted in police officers being dispatched to Resa's home while Cole was in her care. Also, the Court finds by a preponderance of the evidence that Brad encouraged Jan Huffman and Jessica Harbin to stalk Resa, and encouraged Jessica Harbin to make harassing telephone calls to her for which Ms. Harbin was criminally charged.

. . . .

> Also, this Court made it clear to both parties, after consulting with Dr. LeCorgne and Dr. Bouillion that the child should remain at Learning Express Daycare and should attend three (3) days per week instead of two (2) days per week. Again, Brad ignored this Court's directive and sabotaged the situation by involving a private investigator, Robert Williamson, who appeared at the daycare with him on several occasions and who made inquiries concerning the owners of the daycare to Karl Breaux at Breaux's Minute Mart. This resulted in the child being dismissed from the daycare center by the owners, Bernadette and Dale Roberts. At the recommendation of Dr. Bouillion, the child was then placed in Ms. Shannon's

5

Daycare and did very well there. Though the change in daycares may have actually benefitted the child, this does not excuse Brad's behavior in ignoring both the recommendations of Dr. LeCorgne and Dr. Bouillion, as well as the directive of the Court, in order to carry out his own agenda believing the Roberts were somehow favorable to Resa. Yet another adjustment Cole had to endure.

The Court is also concerned about Brad's efforts to turn Lana against her mother in the course of this litigation. Again, he used the help of his cohorts, Jan Huffman and Jessica Harbin, to accomplish his mission. The Court finds it wholly inappropriate to have involved Lana Latiolais in this custody dispute by attempting to drive a wedge between her and her mother. The Court views this behavior as further evidence of Brad's pattern of manipulating women.

The Court also notes that Brad attempted to pressure Juvenile Officer Alex Montgomery, III, to make a finding of child abuse against Resa. The Court finds that Brad went so far as to have then State Senator Donald Cravins contact Officer Montgomery in an effort to obtain the result he wanted--a finding that Resa had physically abused Lana and Cole.

Though Brad was initially invited to join First Baptist Church by Mike Plasek, the Court finds that Brad was well aware that Resa had already been attending that church. However, he chose to become a member, in part, to garner favor with this Court and to sully Resa's reputation. Once he joined the church, Brad set about to ingratiate himself with the pastor, Perry Sanders, by personally handing him donations comprised of cash and checks. Also, Brad wore a yellow bracelet to church which he explained to church members was a demonstration of support for victims of child abuse, which included Cole at the hands of Resa. Brad chose to sit in close proximity to Resa in the church sanctuary to place pressure on her during the church services, eventually resulting [in] her leaving the church and joining another local Baptist church. The Court also finds the statement made by the mother of Brad's other child, Cindy Hebert, in a telephone conversation with attorney Julie Vaughn Felder which occurred on August 15, 2006 to be credible. In that conversation, Ms. Hebert indicated that the reason Brad became involved with First Baptist Church and Reverend Perry Sanders was he believed that this Court would be "crazy" to go against a minister of a church of 10,000 people in this community.

. . . .

The Court also finds that the incident that occurred between Resa and Cindy Hebert at Opelousas General Hospital on November 30, 2005, was orchestrated by Brad.

It is clear from the cell phone records that Brad spoke to Officer Roylis Brent Gallow of the Opelousas Police Department prior to appearing at the hospital. Brad admitted knowing Officer Gallow previously, though he denied speaking to him that day. Again, the Court finds that Brad's testimony in this regard, as well as the testimony of Officer Gallow, is not credible. That morning Brad was bringing the minor child to Opelousas General Hospital for some lab tests associated with a urinary tract infection and was to meet Resa at the hospital. Because of their past acrimony, the Court believes Brad was confident that if he brought Cindy Hebert with him, that Resa would become upset and lose control. Further, he wanted to document Resa's conduct by having Officer Gallow present as a witness. Again, this was a manipulation by Brad to bait Resa into acting inappropriately in a public place and to document her actions. Sadly, Resa predictably took the bait and actually battered Cindy Hebert in the process by shoving her with her elbows as Resa held Cole in her arms. Again, all of this occurred in the presence of the minor child, and was yet another traumatic experience for him involving parental conflict and police officers.

After considering the experts' testimony, the testimony relating Brad's behavior during the proceedings, and other testimony, the trial court finally rendered a final judgment granting Resa and Brad joint custody of Cole, with neither parent designated as the domiciliary parent. Custody was evenly shared and detailed in a document attached to the judgment. Brad and Resa were ordered to continue co-parenting sessions with Dr. Bouillion, and Greg Chappell was ordered to join them, and they were ordered to follow his recommendations with regard to co-parenting Cole. Brad was ordered to begin counseling with Dr. Lynn Aurich, Ph.D. and Resa was ordered to continue counseling with Margot Hasha. It was further ordered that neither party engage in any form of corporal punishment of Cole. In its Reasons for Judgment, the trial court explained that, in spite of Brad's behavior, it was awarding the parties joint custody with no domiciliary parent because it was also concerned with some of Resa's issues. Namely, the trial court found Resa has a "problem with dependency on men," and that, she committed food stamp and medical benefit fraud in an attempt to become financially independent from Brad. Further, the trial court found that while Resa was pursuing her education, she did this "at the expense of her children" and "her ability to manage and care for the children was severely diminished, resulting in inappropriate discipline." The trial court also found that while Resa's use of a wooden spoon to discipline Cole "did not rise to the level of child abuse, ... [it] constitute[s] excessive and inappropriate discipline." The trial court found fault with her relationship with Greg Chappell and her approach to counseling. However, the court found both parties had made a lot of progress with the help of Dr. Bouillion, there was less conflict between them, and Cole was progressing very well. The court found "good cause exists not to name a domiciliary parent" as "[b]oth parents have deficiencies, and while they have shown improvement, there is still work to be done."

Although suit was filed in October 2005, the trial court did not issue its final judgment until October 9, 2008. This three year delay was caused by six preliminary hearings which delayed the trial on the merits

until August 21, 2006, thirteen days of testimony spanning from August 21, 2006 to January 28, 2008, two months of having the case under advisement, and five more months for the trial court to execute a judgment incorporating its reasons for judgment into the final judgment.

The court of appeal reversed, and awarded Resa sole custody of Cole, even though she never asked for sole custody in her pleadings. *Griffith v. Latiolais*, 09-0824 (La.App. 3 Cir. 3/3/10), 32 So.3d 380. The court of appeal faulted the trial court for looking beyond Brad's allegations for seeking custody, i.e., that Resa had engaged in sexual relations with Greg Chappell in Cole's presence during the evacuation and that Resa had physically abused Cole, both of which the trial court found were not proven. When those allegations are set aside, the court of appeal found the balancing factors found in La. C.C. art. 134 clearly fell in Resa's favor. *Griffith*, 32 So.3d at 389. Further, the court of appeal found subsequent events during the course of the trial "improperly expanded the issues and impacted the ultimate result." *Id.* at 390. The court of appeal then summarized the trial court's lengthy analysis of Brad's bad behavior and scant findings of any bad behavior on the part of Resa. *Id.* at 390-92. Accordingly, the court of appeal found no manifest error in the trial court's factual findings, but found error in its "equal balancing of Resa's actions against Bradley's transgressions." *Id.* at 392. Particularly, the court of appeal stated:

> In summary, the trial court found factually that Bradley is devious, manipulative, and retaliatory, and that these base characteristics particularly come to the surface in his dealings with women; that he had little or no involvement in Cole's life prior to filing this suit; that not only was the initial suit without merit, but Bradley's motivation for filing suit was not Cole's best interest, but jealously [sic]; and that Bradley was engaged in a continuing campaign to discredit Resa and influence the trial court decision without regard to the dishonesty of his tactics or the falsity of his assertions. On the other hand, the trial court found that Resa bore the singular responsibility for raising Cole from his birth until after this litigation began; that during that time, she allowed and encouraged Bradley's involvement in Cole's life; that she began an attempt to better educate herself to become more independent of her manipulative former lover and to better care for her son; and that her retaliatory actions between the filing of suit and judgment were directly in response to Bradley's antics.

*Id.* at 393-94. The court of appeal found that the trial court erred in awarding Brad an "equal-sharing custody arrangement-a judgment that is inconsistent when compared to the factual findings." *Id.* at 394.

The court of appeal found that the evidence was clear and convincing that sole custody be awarded to Resa and faulted the trial court for using Dr. Bouillion to regulate Brad's behavior and substituting resolution of the parents' problems for Cole's best interest. *Id.* at 396, 398. The court of appeal found that although Resa did not ask for sole custody in her initial pleading, "the 'best interest' requirement of La. Civ.Code art. 132 mandated an award of sole custody." *Id.* at 394, n. 18. Finally, the court of appeal found the trial

8

court erred in "mandat[ing] that the parties delegate their right to make parental decisions to mental health care professionals on a continuing basis." *Id*. at 397. It found this to be error because the statutes limit the involvement of expert testimony to assisting the trial of fact as allowed by La. C.E. art. 702 and continued professional involvement is only allowed by La. R.S. 9:358.1 whereby a parenting coordinator may be appointed to assist the parties in resolving disputes but only "if the court has previously entered a judgment establishing child custody, other than an ex parte order." *Id*. at 397-98. The court noted that the comments to La. R.S. 9:358.1 indicate the "purpose of this limitation is to prevent the court from using the parenting coordinator process as a means of abdicating its responsibility to make the initial custody determination," which it found the trial court had done in this case. *Id*. at 398. Further, the court of appeal reversed the portion of the judgment prohibiting corporal punishment and assessed all costs against Brad. *Id*. at 398-99. Finally, Brad was granted visitation as follows: the first and third weekends of each month from 6:00 p.m. on Friday until 8:00 p.m. on Sunday of each weekend; equally shared holiday visitation as provided by the trial court; and three weeks summer visitation beginning at 6:00 p.m. on the first Friday of July and ending at 6:00 p.m. on the third Sunday of July. *Id*. at 399-400.

The Louisiana Supreme Court "granted Brad's writ application to determine whether the court of appeal erred in granting Resa sole custody of Cole, especially where she did not ask for sole custody in her pleadings." *Id*. at 1067. Ultimately, the supreme court reversed this court's award of sole custody to Resa and found that the trial court's grant of joint custody was not manifestly erroneous. Further, the supreme court designated Resa as the domiciliary parent. The supreme court upheld both this court's reversal of the trial court's order that "neither party shall engage in any form of corporeal punishment of the minor whatsoever" and the assessment of one hundred percent of the court costs to Brad. Brad filed a motion for clarification of the supreme court's ruling, which was granted. In the order granting the motion for clarification, the supreme court stated that this "case is remanded to the trial court to reconsider its joint custody implementation plan in light of this Court's designation of Resa Latiolais as the domiciliary parent and to amend the plan if it deems appropriate." *Griffith v. Latiolais*, 10-754, (La. 11/17/10), 54 So.2d 1092, 1093.

On remand, the trial court reconsidered its previous joint custody implementation plan and changed it to provide that Resa would be named domiciliary parent, deleted a provision that read "Neither parent may change the current health care providers without the agreement of both parties or further orders of this Court,"

9

changed a provision regarding the procedure should Brad disagree with medical and dental care for Cole that was of a non-emergency nature, and deleted a provision that provided for Cole's attendance at Ascension Day School "unless another school is mutually agreed upon by the parties."

Resa now appeals. She argues that the trial court abused its discretion in reinstating its original award of shared custody between her and Brad on a fifty-fifty basis rather than a schedule of visitation with Cole spending time primarily with her, and with Brad having alternating weekends, one day in the off week, and alternating holiday periods. She also argues that the trial court included several provisions in the joint custody plan that were inconsistent with her status as domiciliary parent.

## DISCUSSION

We previously set forth the standard of review in this case as follows:

> It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* Each child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child. *Barberousse v. Barberousse*, 556 So.2d 930 (La.App. 3 Cir.1990). The best interest evaluation is fact-intensive and requires the weighing and balancing of factors favoring or opposing custody of the competing parties on the basis of the evidence presented in each case. *Romanowski v. Romanowski*, 03-124 (La.App. 1 Cir. 2/23/04), 873 So.2d 656. The trial court is vested with broad discretion in deciding child custody cases and its decision will not be disturbed absent a clear abuse of discretion. *Bagents v. Bagents*, 419 So.2d 460 (La.1982); *Stephens v. Stephens*, 02-402 (La.App. 1 Cir. 6/21/02), 822 So.2d 770. However, as recognized by our supreme court, "[a]n award of custody is not a tool to regulate human behavior." *Everett v. Everett*, 433 So.2d 705, 708 (La.1983).

*Griffith*, 32 So.3d at 386.

Both parties in this case are attempting to have us use the award of custody as a "tool to regulate human behavior." This we cannot do. Again, as we did on our earlier review, we find no manifest error in the factual findings of the trial court. Indeed, our supreme court has upheld this finding. However, the supreme court has also provided guidance in that it reinstated the trial court's original award of joint

10

custody and modified that only insofar as it named Resa as the domiciliary parent. Further, upon motion for clarification, the supreme court explained that the case should be remanded to the trial court for reconsideration of the joint custody implementation plan. But, the supreme court stated that the plan need only be amended if the trial court deemed such amendment appropriate. The original joint custody implementation plan provided that physical custody of Cole be shared by the parties on an alternating weekly schedule from Friday at 6:00 p.m. until the following Friday at 6:00 p.m., with alternating holidays as provided in the plan. The supreme court, by reinstating this plan, inherently found no abuse of discretion by the trial court in the award of shared physical custody of Cole. Accordingly, we cannot now reverse the trial court's award of fifty-fifty shared physical custody.

Resa further alleges that several provisions of the joint custody implementation plan are inconsistent with her status as domiciliary parent and thereby weaken her position. Specifically, she finds fault with the following fourteen provisions: (1) requiring that she provide forty-eight hours advance notice to Brad before spending the night away from home and providing a name and location where she and Cole will stay and a telephone number where they can be reached; (2) requiring that she offer Brad the right to baby-sit if she is away from home overnight; (3) requiring her to provide advance notice if a baby-sitter will be staying with Cole overnight; (4) requiring her to provide reasonable access to Cole by Brad when Cole is in her custody; (5) requiring her to allow Brad to visit with Cole during her custodial periods; (6) requiring her to communicate concerning all factors affecting the health, education, and welfare of the child; (7) requiring her to provide Brad all medical and other information regarding Cole's health and welfare upon receipt; (8) requiring Resa and Brad to discuss all of the information exchanged between them; (9) requiring her not to ignore the authority and input of Brad by failure to communicate; (10) requiring that Cole receive treatment from doctors specified by the trial court; (11) prohibiting Resa's spouse from attending Cole's healthcare appointments "until these parties have reached a more effective level of communication and civil

11

discourse;" (12) requiring extracurricular activities to be by mutual agreement; (13) granting Brad the natural co-tutorship of Cole; and (14) granting Brad authority to administer Cole's property.

Louisiana Revised Statutes 9:335(B)(3) provides, in part, that "[t]he domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise." This recognizes that the trial court has discretion in placing conditions upon the decision making authority of the domiciliary parent. We further note that all of the provisions cited by Resa are made reciprocal by the trial court's plan. We do not find that any of these provisions are outside the trial court's discretion or inconsistent with the trial court's power to create a joint custody implementation plan.

### DECREE

For all of the foregoing reasons, the trial court's judgment is affirmed. All costs of this appeal are assessed to Defendant/Appellant, Resa Latiolais.

**AFFIRMED.**

12